UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 25-14142-CIV- ELA

KHIEM NGUYEN, M.D.

     Plaintiff,

v.

JON ROBERT BROWN, D.O.; and
HCA HEALTH SERVICES OF FLORIDA,
INC. d/b/a HCA FLORIDA ST. LUCIE
HOSPITAL,

     Defendants.

## THIRD AMENDED COMPLAINT

Plaintiff, Khiem Nguyen, M.D. ("Plaintiff" or "Dr. Nguyen"), by and through his undersigned counsel, files this third amended complaint ("Complaint") against defendants Dr. Jon Robert Brown, D.O. ("Dr. Brown"), and HCA Health Services of Florida, Inc. d/b/a HCA Florida St. Lucie Hospital ("HCA") (collectively, "Defendants"), and in support thereof avers as follows:

**The Parties**

1.    Dr. Nguyen is a skilled gastroenterologist and endoscopist, at all relevant times he has been licensed to practice medicine in Florida, and he resides in and is domiciled in the State of Georgia. Therefore, Dr. Nguyen is a citizen of the State of Georgia.

2.    HCA is a Florida corporation (*i.e.*, its state of incorporation is Florida), with a principal place of business in Nashville, Davidson County, Tennessee, which at all relevant times has kept an office for transaction of its customary for-profit business, the operation of a hospital, in Port St. Lucie, St. Lucie County, Florida (the "Hospital"). Therefore, HCA is a citizen of both Tennessee and Florida.

4918-2679-4345, v. 2

3.      Dr. Brown is a general surgeon who practices at HCA and is domiciled in Florida. Therefore, Dr. Brown is a citizen of Florida.

### Jurisdiction and Venue

4.      This matter was originally filed in Defendants' home (Florida) state court, but was removed to this Court by one or more of the Defendants by invoking federal question jurisdiction, 28 U.S.C. § 1331.  However, this pleading does not assert a claim arising under federal law.

5.      Pursuant to 28 U.S.C. § 1332(a), this Court has diversity subject matter jurisdiction over this action because:

      a.   Plaintiff, Dr. Nguyen, is a citizen of Georgia, *see* paragraph 1 above;

      b.   HCA is a citizen of Tennessee and Florida, *see* paragraph 2 above;

      c.   Dr. Brown is a citizen of Florida, *see* paragraph 3 above; and

      d.   the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over HCA because it is a Florida corporation that operates its Hospital in St. Lucie County, Florida.

7.      This Court has personal jurisdiction over Dr. Brown because he resides in Florida.

8.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.  28 U.S.C. § 1391(b)(2).

### General Allegations Common to All Counts

9.      Plaintiff commenced practicing at HCA's Hospital in Port St. Lucie in 2008 and worked there for more than a decade, including in the year 2020, but does not work there anymore.

### June 22, 2020 Surgery

10.      On June 22, 2020, a patient ("Patient") presented to the Hospital with biliary colic and an abnormal ultrasound and abdominal/pelvic CT and abdominal magnetic resonance

4918-2679-4345, v. 2

cholangiopancreatography, for which Plaintiff performed an uneventful endoscopic retrograde cholangiopancreatography ("ERCP").  An image of the ERCP procedure is filed conventionally under seal as **Sealed Exhibit 1**.

11.     Sealed Exhibit 1 reflects the Patient's pancreatic head, duct, and tail in dark grey to the right of the scope, and demonstrates the ERCP procedure did not touch the pancreatic head, duct, or tail.

12.     The Patient was discharged from the Hospital that same day, June 22, 2020, but was re-admitted the following evening for a known and expected complication and was recovering.

### June 23, 2020 Hospital Records, CT Scans Confirm Pancreatic Duct Intact

13.     Upon re-admission to the Hospital on June 23, 2020, an abdominal/pelvic CT scan, with contrast, was performed and the report therefor ("June 23, 2020 CT") confirmed the Patient had pancreatitis with an intact pancreatic duct.  A copy of the June 23, 2020 CT is filed conventionally under seal as **Sealed Exhibit 2**.

14.     The June 23, 2020 CT contains an impression that there is mesenteric haziness around the pancreatic head, which confirms the pancreatic head is in tact.

15.     A contemporaneous June 23, 2020 emergency provider report ("June 23, 2020 Emergency Provider Report") on page 6 thereof contains a similar impression that there is mesenteric haziness around the pancreatic head, which confirms the pancreatic head is in tact, and on page 9 thereof reflects that the Patient was stabilized by that time.  A copy of the June 23, 2020 Emergency Provider Report is filed conventionally under seal as **Sealed Exhibit 3**.

16.     By June 28, 2020, the Patient was tolerating clear liquids and was advancing toward a full liquids diet, as is reflected on pages 1 and 2 of a June 28, 2020 gastroenterology progress

note for the Patient ("June 28, 2020 Gastroenterology Progress Note").  A copy of the June 28, 2020 Gastroenterology Progress Note is filed conventionally under seal as **Sealed Exhibit 4**.

17.     The Patient would not have been able to tolerate clear liquids nor be advancing toward a full liquids diet if the Patient's pancreatic duct was injured.

18.     Therefore, the Patient's pancreatic duct was not injured on June 28, 2020.

### June 28, 2020 Cardiac Arrest; Records Show Pancreatic Duct in Tact

19.     The Patient was scheduled to be discharged on June 29, 2020.

20.     However, the Patient sustained a cardiac arrest event the day prior, June 28, 2020 ("Heart Attack").

21.     After sustaining the Heart Attack, the Patient was not discovered by HCA's nursing staff for several hours, which resulted in the Patient suffering anoxic encephalopathy (lack of oxygen to the brain) and required at least a half hour of CPR, as is reflected on page 1 of a cardiology consultation report dated June 29, 2020 ("June 29, 2020 Cardiology Report"), a copy of which is filed conventionally under seal as **Sealed Exhibit 5**.

22.     The June 29, 2020 Cardiology Report, on page 13, reflects that the Heart Attack was likely secondary to hypokalemia – low potassium – and electrolyte imbalance, rather than pancreatitis following the ERCP.  Instead, post-ERCP pancreatitis is only reflected as being acute, meaning localized and separate from the Heart Attack.  *See* **Sealed Exhibit 5**, p. 13.

23.     HCA's delay in ascertaining that the Patient had suffered a cardiac arrest caused the Patient to suffer anoxic encephalopathy (lack of oxygen to the brain) and enter a ventilator-dependent vegetative state, which caused Patient's pancreatitis to worsen.  This is reflected in the impressions on page 2 of a report dictated by physician Paul Schmidt, MD on June 29, 2020 ("June

4918-2679-4345, v. 2

29, 2020 Schmidt Report"). A copy of the June 29, 2020 Schmidt Report is filed conventionally under seal as **Sealed Exhibit 6**. The date of dictation is reflected as "DD" on page 2 thereof.

24. A contemporaneous June 29, 2020 critical care consultation note ("June 29, 2020 Critical Care Note"), specifically on page 1 thereof, reiterates that prior to the Heart Attack, the Patient's pancreatitis was improving and the Patient was tolerating clear liquids. A copy of the June 29, 2020 Critical Care Note is filed conventionally under seal as **Sealed Exhibit 7**.

25. A June 30, 2020 CT exam ("June 30, 2020 CT Exam") reflects that there was no significant change in the Patient's pancreatitis by that point. A copy of the June 30, 2020 CT Exam is filed conventionally under seal as **Sealed Exhibit 8**.

26. Cardiology progress notes from June 30, 2020 ("June 30, 2020 Cardiology Progress Notes"), specifically at page 8 thereof, reiterate that the Heart Attack that resulted in anoxic brain injury was likely secondary to the hypokalemia and electrolyte imbalance, rather than acute post ERCP pancreatitis. A copy of the June 30, 2020 Cardiology Progress Notes is filed conventionally under seal as **Sealed Exhibit 9**.

27. Additional cardiology progress notes from July 1, 2020 and July 2, 2020 also reiterate that the Heart Attack that resulted in anoxic brain injury was likely secondary to the hypokalemia and electrolyte imbalance, rather than acute post ERCP pancreatitis. A copy of the cardiology progress note of July 1, 2020 is filed conventionally under seal as **Sealed Exhibit 10**. A copy of the cardiology progress note of July 2, 2020 is filed conventionally under seal as **Sealed Exhibit 11**.

28. A July 6, 2020 nephrology progress note, a copy of which is filed conventionally under seal as **Sealed Exhibit 12**, reflects that the Heart Attack caused the Patient to suffer an acute kidney injury, in particular on page 5 thereof.

4918-2679-4345, v. 2

29.     A July 8, 2020 gastroenterology progress note, a copy of which is filed conventionally under seal as **Sealed Exhibit 13**, reflects on page 2 thereof that the post-ERCP pancreatitis was resolved by that date, and states that antibiotics should be discontinued.

30.     A July 13, 2020 CT examination report ("July 13, 2020 CT examination report"), a copy of which is filed conventionally under seal as **Sealed Exhibit 14**, reflects that the head of the Patient's pancreas was intact, and reflects there was fluid in the retroperitoneum, suggesting a hemorrhage in the retroperitoneum or in the pancreas.

31.     The findings of that July 13, 2020 CT examination report were communicated to Plaintiff, who on or about July 17, 2020 – without physically exploring the abdomen – determined the retroperitoneum (a pocket that isolates the pancreas, spleen, and kidneys away from other organs) was bleeding, and that the pancreas was not bleeding.  It was suspected that the bleeding was spontaneous and was contained (stable) within the retroperitoneum, as a result of the Patient developing Heparin antibody, which prevented blood from clotting.  A copy of Plaintiff's July 17, 2020 examination report is filed conventionally under seal as **Sealed Exhibit 15**.  *Compare* **Sealed Exhibit 15**, p. 2, Free Text A&P, *with* **Sealed Exhibit 13**, p. 2.

32.     In the interim between July 13 and July 17, 2020, one Dr. Kurtin, on or about July 16, 2020, examined the Patient and dictated a notation in the Patient's medical chart that specifically states he would not recommend to explore the Patient's abdomen at that time because doing so may very likely lead to worsening of the bleeding.  A copy of the July 16, 2020 dictation, which was subsequently transcribed on July 17, 2020 and authenticated on July 27, 2020, is filed conventionally under seal as **Sealed Exhibit 16**.

33.     That medical determination not to explore the abdomen was so important that Dr. Kurtin added a consultation note to the Patient's medical chart on July 16, 2020 specifically

pleading others to read his July 16, 2020 dictation.  A copy of the July 16, 2020 consultation note is filed conventionally under seal as **Sealed Exhibit 17**.

34.     Thus, in sum, by July 17, 2020, the Patient's medical records confirmed the Patient's pancreatic head and duct were intact, the likely cause of the Patient's Heart Attack and resultant anoxic brain injury was the lack of potassium (hypokalemia) and electrolyte imbalance along with HCA's delay in responding to the Heart Attack, and contained a plea by a doctor for others not to further explore the Patient's abdomen.

<u>**Dr. Brown's July 21, 2020 Pancreatic Necrosectomy**</u>

35.     On or about July 21, 2020, defendant Dr. Brown, an osteopathic physician, proceeded to explore the Patient's abdomen and performed a pancreatic necrosectomy on the head of the Patient's pancreas while Patient was in a vegetative state.  A copy of Dr. Brown's operative report for the July 21, 2020 necrosectomy is filed conventionally under seal as **Sealed Exhibit 18**.

36.     Dr. Brown opened up the Patient's retroperitoneum, and scooped out pancreatic head material from the Patient, without delineating the different structures associated with the pancreas associated with the pancreas and without any notation that any specimen was sent for pathologic evaluation.  *See* **Sealed Exhibit 18**, page "2091 of 4526".

37.     Stunningly, a July 22, 2020 report electronically signed by Dr. Brown, a copy of which is filed conventionally under seal as **Sealed Exhibit 19**, reiterates at page 5 thereof under Recommendations Dr. Kurtin's emphasis on July 16, 2020 not to explore the Patient's abdomen because doing so may very likely lead to worsening of bleeding.

38.     Nevertheless, Dr. Brown explored the Patient's abdomen *again* and removed more pancreatic material, as is reflected in a July 23, 2020 operative report, a copy of which is filed conventionally under seal as **Sealed Exhibit 20**, *see* "Page 2088 of 4526".

7

39.     The full extent of what Dr. Brown scooped out of the Patient cannot be ascertained by Plaintiff because there is no pathology report, or at least none made available to the Plaintiff, for the material Dr. Brown removed from the Patient, dispute the industry standard requiring the transmission of removed material to pathology for reporting.

**July 28, 2020 Report for MRCP Suggests Infection by Pancreatic Head**

40.     Approximately one week after Dr. Brown's necrosectomy, an abdominal and pelvic CT examination and a follow-up a magnetic resonance cholangiopancreatography ("MRCP") and MRI were conducted on the Patient.

41.     The CT examination report was originally signed at 7:47 am on July 28, 2020 ("July 28, 2020 CT Report"), and reflects there was a postsurgical change with soft-tissue air along the collection close to the head of the Patient's pancreas.

42.     Such a statement about soft-tissue air along the head of the pancreas and a collection implies there was a possible abscess close to the head of the Patient's pancreas and that the head of the pancreas had been removed or damaged, along with the pancreatic duct.

43.     In turn, an abscess close to the head of the Patient's pancreas implies there was an infection close to the head of the Patient's pancreas.

44.     The July 28, 2020 CT Report states a carbon copy thereof was sent to Dr. Brown.

45.     Accordingly, at or around 7:47 am on July 28, 2020, Dr. Brown received a copy of the July 28, 2020 CT Report, or at least the findings thereof were communicated to Dr. Brown at or around that time on that day, which, again, implied there was an infection close to the head of the Patient's pancreas and that the head of the pancreas along with the duct were removed or damaged following Dr. Brown's necrosectomy.

8

46.     One hour and eight minutes later, *i.e.*, at 8:55 am on July 28, 2020, one Dr. Sem created an addendum to the July 28, 2020 Report ("July 28, 2020 Addendum").

47.     A copy of the July 28, 2020 CT Report with the July 28, 2020 Addendum are filed conventionally under seal as **Sealed Exhibit 21**.

48.     The July 28, 2020 Addendum states the collection in the head of the pancreas may be due to the location of *the* regional injury during ERCP to the side wall of the distal pancreatic duct, causing localized focal pancreatitis.

49.     Thus, the July 28, 2020 Addendum asserts there was, in fact, an injury that the Patient sustained to the Patient's pancreatic duct during the ERCP, which ERCP was performed by the Plaintiff, Dr. Nguyen.

50.     As such, the July 28, 2020 Addendum effectively asserts Plaintiff injured the Patient's pancreatic duct during the ERCP, that such injury caused the Patient to suffer pancreatitis, and that such injury created the collection at the head of the pancreas indicative of an infection.

51.     However, the core premise was false, as Plaintiff did not injure the Patient's pancreatic duct during the ERCP.

52.     Therefore, the July 28, 2020 Addendum contains a materially false representation that Plaintiff injured the Patient's pancreatic duct during the ERCP.

53.     The contemporaneous July 28, 2020 MRI, a copy of which is conventionally filed under seal as **Sealed Exhibit 22**, which was prepared by a different doctor, references a pancreatic duct leak, but does not attribute it to the ERCP.

#### Subsequent Records Refer to Pancreatic Injury in Connection with ERCP

54.     Following the creation of the July 28, 2020 Addendum, more than a week of successive pulmonology reports for the Patient reference the fact that the report for the MRCP (as

9

amended by the Addendum) notes a pancreatic injury was sustained in connection with the ERCP ("Subsequent Records"), which ERCP, again, Plaintiff performed.

55.     Such Subsequent Records include, without limitation:

a.  a July 30, 2020 pulmonology report, **Sealed Exhibit 23**, *see* p. 21 of 22;

b.  a July 31, 2020 pulmonology report, **Sealed Exhibit 24**, *see* p. 22 of 23;

c.  an August 1, 2020 pulmonology report, **Sealed Exhibit 25**, *see* pp. 25-26 of 27;

d.  an August 2, 2020 pulmonology report, **Sealed Exhibit 26**, *see* pp. 25-26 of 28;

e.  an August 3, 2020 pulmonology report, **Sealed Exhibit 27**, *see* p. 29 of 29;

f.  an August 4, 2020 pulmonology report, **Sealed Exhibit 28**, *see* p. 28 of 29;

g.  an August 5, 2020 pulmonology report, **Sealed Exhibit 29**, *see* p. 28 of 29; and

h.  an August 6, 2020 pulmonology report, **Sealed Exhibit 30**, *see* p. 27 of 28.

56.     Most, if not all, of the Subsequent Records state Dr. Brown was the attending physician with respect thereto, which implies Dr. Brown oversaw, supervised, or was otherwise involved with the creation of those Subsequent Records.

57.     Two of those Subsequent Records use the words "per Surg" in connection with a reference to the ERCP (which Plaintiff performed) and after stating the pancreatic duct injury was noted on the report for the MRCP, and discovery will likely establish that such terminology means:

a.  Surgeon Dr. Brown caused the MRCP report to note a pancreatic ductal injury in connection with the ERCP; or

b.  Surgeon Dr. Brown caused the Subsequent Reports to reference the pancreatic duct injury on the MRCP report, or both.

*See* **Sealed Exhibit 25**, p. 26 of 27; **Sealed Exhibit 26**, p. 26 of 28.

10

4918-2679-4345, v. 2

58.     The references in the Subsequent Records that the ERCP (which Plaintiff Dr. Nguyen performed) caused the Patient to suffer a pancreatic duct injury are false, as Plaintiff's ERCP did not cause a pancreatic duct injury.

### **Subsequent Demise of Patient**

59.     Following Dr. Brown's surgery, the Patient developed multiple abscesses and infections in the Patient's pancreas, and the Patient never recovered.

60.     The Patient's family eventually placed the Patient into hospice care, and the Patient ultimately passed away within one year after Dr. Brown's surgery, in May 2021.

61.     In connection with the Patient's demise, a certificate of death for the Patient was issued on May 7, 2021 ("Death Certificate"), a copy of which is filed conventionally under seal as **Sealed Exhibit 31**.

62.     In the Death Certificate, the medical examiner attributed the cause of death to anoxic brain injury secondary to complications of endoscopy, and indicated the endoscopy was performed 11 months prior, *i.e.*, in June 2020.

63.     Plaintiff performed the June 2020 endoscopy (the ERCP).

64.     After the Patient's demise, the Patient's next of kin served Plaintiff with a notice of intention to file a malpractice action, which matter was ultimately resolved without any admission of fault by Plaintiff ("Adversary Proceedings Against Plaintiff").

65.     Nevertheless, there is a notation on the United States Department of Health & Human Services' National Practitioner Data Bank ("NPDB") Report for Plaintiff indicating Plaintiff caused the Patient's death, which notation relates to the Adversary Proceedings Against Plaintiff.

4918-2679-4345, v. 2

66.     Prior to filing this lawsuit, Plaintiff requested HCA take such action as is necessary to perform a complete investigation into Dr. Brown's involvement with respect to the Patient's medical records, restore all information to the Patient's file that has been removed, correct the Patient's certificate of death to reflect that Plaintiff did not cause the Patient's demise, and submit a report to the NPDB that is accurate and omits any reference to Plaintiff having been responsible the Patient's demise, to no avail.

67.     All conditions precedent to this action have been performed or have occurred.

## COUNT ONE
**(Negligence Against Dr. Brown)**

68.     Plaintiff incorporates herein all averments of paragraphs 1 through 67 above as if they were set forth fully herein.

69.     "It is clearly established that one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." *Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 66–67 (Fla. 1996).

70.     Dr. Brown undertook to act with respect to the medical care of the Patient, and in connection therewith undertook to create and participate in the creation of records, and to oversee and supervise the recordkeeping of others with respect to the care and diagnoses the Patient received while the Patient was at the Hospital.

71.     Dr. Brown performed those undertakings while the Patient was in a vegetative state.

72.     As such, Dr. Brown knew or reasonably should have known that the Patient was not likely to recover from the vegetative state the Patient was in.

73.     Under the facts and circumstances of this case, Dr. Brown had a duty not to contribute to or permit the creation of false information about the Plaintiff's procedures for the Patient, and the Patient's injuries, in the Patient's medical records.

4918-2679-4345, v. 2

74. At all relevant times, Plaintiff has been within the foreseeable zone of danger or risk of the breach by Dr. Brown of that duty such that the duty extends to protect Plaintiff against a breach by Dr. Brown of that duty.

75. Specifically, as stated above, Dr. Brown became acquainted with the Patient while the Patient was in a vegetative state at the Hospital.

76. As such, as stated above, Dr. Brown knew or reasonably should have known that the Patient was not likely to recover from the vegetative state the Patient was in.

77. By July 28, 2020, Dr. Brown knew Plaintiff had performed an ERCP on the Patient.

78. By July 28, 2020, Dr. Brown knew or reasonably should have known that, in the event of the Patient's reasonably foreseeable demise, the Patient's next of kin was likely to file one or more medical malpractice actions with respect to the medical care the Patient received while at HCA's Hospital (which the Patient's next of kin foreseeably subsequently did).

79. By July 28, 2020, Dr. Brown knew or reasonably should have known that in the likely event of the Patient's demise, the Patient's medical records would be examined by the Patient's next of kin and a medical examiner.

80. As such, it was reasonably foreseeable by Dr. Brown by July 28, 2020 that the accuracy of the Patient's medical records would be material to reasonably foreseeable legal action that was likely to be instituted by the Patient's next of kin against not only the Hospital but the physicians, like Plaintiff, whose names were in those medical records, after the Patient's likely demise.

81. Accordingly, by July 28, 2020, it was reasonably foreseeable by Dr. Brown that false representations in the Patient's medical chart that falsely attribute fault for a pancreatic ductal injury unto Plaintiff's ERCP, when Plaintiff's ERCP did not cause a pancreatic ductal injury to

13

Patient, would cause Plaintiff to suffer damages after the Patient's likely demise, including by way of a medical examiner reviewing and relying upon such medical records and certifying in a death certificate that the Patient's cause of death, anoxic brain injury, was secondary to Plaintiff's ERCP.

82.     Dr. Brown breached that duty.

83.     Specifically, discovery will likely establish that:

   a.   between 7:47 am and 8:55 am on July 28, 2020, Dr. Brown received a copy of the July 28, 2020 Report from, or the information therein was conveyed to Dr. Brown via telephone or electronically by, the radiologist who authored that report, Dr. Sem;

   b.   upon or following receipt of that report or the information therein, Dr. Brown expressed to the radiologist, Dr. Sem, that Plaintiff's ERCP injured the Patient's pancreatic duct;

   c.   Dr. Brown knew or should have known at that time that Plaintiff's ERCP did not injure the Patient's pancreatic duct; and

   d.   Dr. Brown knew or should have known that the radiologist, Dr. Sem would reference an injury during the ERCP to the Patient's pancreatic duct in an addendum to the July 28, 2020 Report.

84.     Dr. Sem foreseeably created an addendum to the July 28, 2020 Report (the July 28, 2020 Addendum) that attributed a pancreatic duct injury to an ERCP, and Plaintiff performed that ERCP.

85.     Dr. Brown's breach of duty was compounded each and every time reference was made in the Patient's medical chart to such an injury being caused by Plaintiff's ERCP, including without limitation in the Subsequent Records.

86. The representation in the July 28, 2020 Addendum, and in each of the Subsequent Records, that Plaintiff's ERCP injured the Patient's pancreatic duct, was and is untrue, as Plaintiff's ERCP did not injure the Patient's pancreatic duct.

87. In fact, if Plaintiff's ERCP had injured the Patient's pancreatic duct, the Patient would not have been recovering and advancing toward a full liquids diet prior to the anoxic encephalopathy of June 28, 2020, but the Patient was so recovering and advancing.

88. Dr. Brown's breach of duty caused Plaintiff to suffer damages in excess of $75,000 after the Patient's May 2021 demise.

89. Specifically, but without limitation, discovery is likely to establish that the medical examiner relied in whole or in part on the Patient's medical records that refer to the Plaintiff's ERCP as causing the Patient to suffer a pancreatic ductal injury, such as the July 28, 2020 Addendum and the Subsequent Records, when the medical examiner referred to Plaintiff's ERCP as a cause of the Patient's death in the Patient's certificate of death.

90. The damages Dr. Brown's breach caused Plaintiff to suffer also include, without limitation, inclusion of a reference to Plaintiff being the cause of the Patient's death in the NPDB, reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future.

*WHEREFORE*, Plaintiff respectfully requests judgment be entered in his favor against Dr. Brown:

      a. Awarding Plaintiff compensatory damages, past, present, and future;

b.      Awarding Plaintiff reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future;

c.      Ordering the correction of the records in the Patient's medical file that were improperly manipulated in any way;

d.      Awarding Plaintiff taxable costs and such further relief as the Court deems equitable and just.

## COUNT TWO
### (Negligence Against HCA)

91.     Plaintiff incorporates herein all averments of paragraphs 1 through 67 above as if they were set forth fully herein.

92.     HCA was at all relevant times custodian of the Patient's medical records.

93.     By July 28, 2020, HCA knew that the Patient was in a vegetative state and was unlikely to recover from that vegetative state.

94.     In addition, discovery will likely establish that by July 28, 2020:

a.  HCA's risk management team or risk management department had met with the Patient's family, and thus,

b.  HCA knew that in the likely event of the Patient's demise, the Patient's next of kin would likely institute a medical malpractice action against HCA.

95.     HCA's awareness that litigation by the Patient's next of kin was likely is corroborated by an August 7, 2020 case management report for the Patient ("August 7, 2020 CMR"), a copy of which is conventionally filed under seal as **Sealed Exhibit 32**, which indicates:

4918-2679-4345, v. 2

a. on July 9, 2020, a behavioral emergency response team was required to meet with the Patient's family to handle how they were responding the Patient's state of being;

b. by July 21, 2020, HCA did not believe the Patient's family had realistic expectations about the Patient's recovery; and

c. by July 22, 2020, another hospital or healthcare facility, Kindred, to whom HCA was attempting to transfer the Patient denied the transfer due to that facility's belief that there was no potential recovery.

96.     Under the facts and circumstances of this case, by July 28, 2020, HCA had a duty to ensure the medical records of the Patient in HCA's custody did not include false information about the Plaintiff's procedures for the Patient and the Patient's injuries.

97.     In addition, discovery is likely to establish HCA knew and represented that its duty to maintain accurate patient medical records extended to physicians like Plaintiff, including by way of representations to that effect in HCA's by-laws, code of conduct, policies, or other governing documents, and HCA should accordingly be estopped from denying its duty to maintain accurate medical records extended to the Plaintiff.  For example, a copy of HCA's code of conduct is attached hereto as **Exhibit A**, in which HCA represented that its healthcare colleagues and affiliated physicians are stakeholders of HCA to whom HCA's institutions (like the Hospital) "see[] itself as having obligations," *see* Exhibit A, p. 5, and in which HCA prohibits the entry of any false information on any record or document, *see id.*, p. 11.

98.     Nevertheless, HCA did not take reasonable precautions to ensure the accuracy of its medical records as they relate to Plaintiff Dr. Nguyen and with respect to this Patient, and did

17

not exercise reasonable oversight or supervision over the documents in its custody when litigation relating to those documents was reasonably foreseeable, and thereby breached its duty.

99. Specifically, the representation in the July 28, 2020 Addendum, and in each of the Subsequent Records, that Plaintiff's ERCP injured the Patient's pancreatic duct, was and is untrue, as Plaintiff's ERCP did not injure the Patient's pancreatic duct.

100. By failing to ensure the Patient's medical chart contained accurate information about the Plaintiff's procedures for the Patient, and the Patient's injuries, including by failing to correct or investigate false representations that Plaintiff's ERCP caused an injury to the Patient's pancreatic duct of which HCA knew or should have known, HCA breached its duty of care.

101. HCA's breach of duty caused Plaintiff to suffer damages in excess of $75,000 after the Patient's May 2021 demise.

102. Specifically, discovery is likely to establish that the medical examiner relied in whole or in part on the Patient's medical records that refer to the Plaintiff's ERCP as causing the Patient to suffer a pancreatic ductal injury, such as the July 28, 2020 Addendum and the Subsequent Records, when the medical examiner referred to Plaintiff's ERCP as a cause of the Patient's death in the Patient's certificate of death.

103. The damages HCA's breach caused Plaintiff to suffer also include, without limitation, inclusion of a reference to Plaintiff being the cause of the Patient's death in the NPDB, reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future.

**WHEREFORE**, Plaintiff respectfully requests judgment be entered in his favor against HCA:

18

a.      Awarding Plaintiff compensatory damages, past, present, and future;

b.      Awarding Plaintiff reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future;

c.      Ordering the correction of the records in the Patient's medical file that were improperly manipulated in any way; and

d.      Awarding Plaintiff taxable costs and such further relief as the Court deems equitable and just.

## COUNT THREE
### (Vicarious Liability Against HCA)

104.    Plaintiff incorporates herein all averments of paragraphs 1 through 67 above as if they were set forth fully herein.

105.    Dr. Brown acted as an agent of HCA in connection with HCA's keeping of records, including the responsibility to ensure HCA's medical records are accurate, including those of the Patient. *See, e.g.*, Exhibit A, p. 11.

106.    Specifically, discovery will likely establish that HCA owned and owns Dr. Brown's medical group, and that by virtue of HCA's ownership of Dr. Brown's medical group and exercise of control over and ability to control his actions including with respect to recordkeeping, Dr. Brown was and is an actual agent of HCA; that Dr. Brown was employed by HCA and HCA is vicariously liable for his recordkeeping activity therefor; or that, in the event Dr. Brown was not an employee of HCA and that at the relevant times HCA did not own Dr. Brown's medical group, HCA nevertheless placed Dr. Brown in a position of control over the narrative of the medical records for the Patient such that Dr. Brown was in fact acting as HCA's actual agent in connection with

4918-2679-4345, v. 2

maintaining HCA's records for the Patient, any one of which would be sufficient to establish actual agency.

107.    Dr. Brown's actions on and after July 28, 2020 were within the scope of and performed during the course of his agency relationship with HCA.

108.    Dr. Brown's actions on and after July 28, 2020 were done to further an interest of HCA.

109.    Specifically, discovery will likely establish that:

a.  by July 28, 2020, HCA's risk management team or risk management department had met with the Patient's family, and thus,

b.  by July 28, 2020, HCA knew that in the likely event of the Patient's demise, the Patient's next of kin would likely institute a medical malpractice action against HCA, and

c.  Dr. Brown's actions on and after July 28, 2020 were done to further HCA's interest in not being attributed fault for the Patient's demise.

110.    In addition, HCA's awareness that litigation by the Patient's next of kin was likely, and that the medical records for the Patient would be integral components of such litigation, while Dr. Brown was exercising control over the narrative of events in those medical records for the benefit of HCA, is corroborated by the August 7, 2020 CMR, **Sealed Exhibit 32**, which indicates:

a.  on July 9, 2020, a behavioral emergency response team was required to meet with the Patient's family to handle how they were responding the Patient's state of being;

b.  by July 21, 2020, HCA did not believe the Patient's family had realistic expectations about the Patient's recovery; and

4918-2679-4345, v. 2

     c.   by July 22, 2020, another hospital or healthcare facility, Kindred, to whom HCA was attempting to transfer the Patient denied the transfer due to that facility's belief that there was no potential recovery.

111.    Following the Patient's May 2021 demise, Plaintiff Dr. Nguyen suffered damages in excess of $75,000 as a result of Dr. Brown's actions and representations with respect to the Patient's medical records, which constituted a breach of Dr. Brown's duty of care, for which HCA is vicariously liable.

112.    Discovery is likely to establish that the medical examiner relied in whole or in part on the Patient's medical records that refer to the Plaintiff's ERCP as causing the Patient to suffer a pancreatic ductal injury, such as the July 28, 2020 Addendum and the Subsequent Records, when the medical examiner referred to Plaintiff's ERCP as a cause of the Patient's death in the Patient's certificate of death.

113.    The damages Plaintiff suffered also include, without limitation, inclusion of a reference to Plaintiff being the cause of the Patient's death in the NPDB, reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future.

*WHEREFORE*, Plaintiff respectfully requests judgment be entered in his favor against HCA:

     a.    Awarding Plaintiff compensatory damages, past, present, and future;

     b.    Awarding Plaintiff reputation damages, past, present, and future, and damages for emotional distress, humiliation, mental anguish and distress, past, present and future, and for loss of earnings and lost earning capacity, past, present and future;

21

c.       Ordering the correction of the records in the Patient's medical file that were improperly manipulated in any way;

d.       Awarding Plaintiff taxable costs and such further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable in this matter.

Respectfully submitted,
Nason Yeager Gerson Harris & Fumero, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, Florida 33410
Tel: (561) 686-3307
Fax: (561) 686-5442
*Attorneys for Plaintiff, Dr. Khiem Nguyen, M.D.*
rlevenstein@nasonyeager.com
akesselman@nasonyeager.com
mhernandez@nasonyeager.com

Dated: October 1, 2025          By:    *s/ Aaron J. Kesselman*
                                      Richard H. Levenstein, Esq. (FBN 235296)
                                      Aaron J. Kesselman, Esq. (FBN 1018107)

22

4918-2679-4345, v. 2